William Rowton, sen. having recovered, by an action of ejectment in Prince E)d-ward District Court, a tract of land, of which his son Joseph Rowton was in possession at the time of his death, Mary Sow-ton, the widow, filed a bill of injunction in the High Court of Chancery stating, that a contract had been made between the said William and Joseph, that, if the latter would remove from New River, where he had resided, to the county of Charlotte, and settle in his neighborhood, the former would give him a title in fee-simple to the said tract of land; that Joseph Rowton had accordingly removed at a great expense, and made valuable improvements on the land; that, in consideration thereof, he was entitled to a specific execution of the contract, and the complainant his widow to dower in the said land. *The answer denied all the material allegations in the bill; insisting that Joseph Rowton, was entitled by the agreement to a life estate only, and that if he died without children, the land was to revert to William Rowton and his heirs, and also relying on the statute of frauds, as the contract had not been in writing.
A great variety of contradictory evidence was exhibited on both sides. The Chancellor finally decreed that the widow Was entitled to dower, and perpetuated the injunction ; from which decree an appeal was taken to this Court.
Wickham, for the appellant, stated, that the only question was, whether the wife could be endowed of an equitable estate, which belonged to her late husband; and it was a mere matter of evidence, in this case, whether the husband had such an estate, or not; for it was not even asserted that he had a legal estate. If the husbaiid died since the act of 1785, as it was said he did, (viz. in 1793,) he was not prepared to say that the wife was not entitled to dower ; provided it should appear that he had such an equity in a fee simple estate as would authorise a Court of Chancery to decree the legal estate. But he could not admit that this was proved by the testimony in the cause.
Call, on the same side. The principal, and, perhaps, the only question in this cause is, whether there ever did exist such a contract as that stated in the bill. Some of the witnesses, indeed, attempt to prove that old Rowton, the father of the appel-lee’s husband, did promise his son that if he would remove from New River, the place of his residence, and settle by him, he would, by his will, give him the land, of which dower is now claimed ; and that, in consequence of this promise, the son did actually remove, and take possession of the land; on which he made considerable improvements. Opposed to this is the testimony of witnesses, much more numerous, and equally respectable, proving, that both the old man and his son, declared that, as the latter had no children, he was only to have an estate for life in the land; in case he survived his father. The uniform system of old Row-to« appears to have been never to give an estate in fee-simple, to any of his children, lest they might die without issue, and the lands go out of his family. This is strong presumptive evidence that no such contract as that contended for by the appellee ever *54 did exist. But if the court should be of opinion that there is any weight in the evidence adduced on the part of the appellee, yet the Chancellor certainly erred in making a final decree, in the first instance. Where there is such contradictory evidence, an issue ought to have been directed.
Randolph, for the appellee. Whatever the evidence may be, in this case, ours is a most reasonable claim. Notwithstanding the appellant, in his answer, so roundly denies those parts of the allegations of the bill to which it is responsive, and introduces new matter by way of ayoid-anee, *yet the answer is not evidence; because it is contradicted as to the first, and unsupported as to the latter by the whole current of testimony. It will be found from the evidence, either that Joseph Rowton, the husband of the appellee, had a right, which might be enforced to a fee-simple estate from his father, or that there are peculiar equitable circumstances, in this case, which entitle the wife to dower. He then took a comprehensive view of the evidence; from which he concluded, that a sufficient consideration was established to have entitled Joseph Rowton to a specific executon of the contract, by a conveyance of the land in fee-simple; and that his declarations concerning his want of title arose from an erroneous impression on his part, that because no writing had passed between his father and himself, he was without remedy. But declarations made under an ignorance of law or fact, cannot prejudice the party making them.
Mr. Wickham had said that this cause depended upon a mere matter of fact. He whs of the same opinion; and of course nothing was to be said about the statute of frauds. But if there should be, it might be answered, that the statute was not pleaded, and that the contract was executed. Joseph Rowton having an equitable fee-simple estate vested in him, the wife was legally entitled to dower. But she had also strong equitable and moral claims. Having been induced by the promises of old Rowton to forsake a comfortable abode among her friends, and having contributed jointly with her husband to the improvement of the land, she had a right to expect a shelter from the inclemency of the weather. To deprive her of this right, and to give to the heirs of old Rowton the fruits of all the labour of his son expended on the land, would be to encourage the height of fraud and iniquity.
Wickham in reply. It is unnecessary to take up the time of this Court in considering what will be the situation of the wife, if she should not recover her dower. The only question is, whether the husband had a fee-simple; for in no other estate can dower be had in this country. He would consider the case as if the husband was now before the Court, applying for a specific performance of the agreement.
The contract attempted to be proved was a mere nudum pactum, and might be revoked at any time. It is denied that it ever did exist, to the extent contended for by the appellee. The statute of frauds was as substantially pleaded, as is ever required in a Court of Equity; the defendant, *in his answer, after denying the allegations of the bill, insists, that the agreement, being a mere parol one, could not have been enforced, so as to entitle the wife to dower.
The improvements, which have been relied upon as forming a consideration for a specific execution, were no more than such as a tenant for life would be induced to make. There was no fraud in permitting the son to carry them on ; because the old man 'always declared that he never would give him an absolute estate in the land, unless he had children. It is admitted that Joseph might have enforced a life estate, but nothing more. And all the testimony may be reconciled by considering the contract asa gift to Joseph for life, remainder to his children.
Curia advisare vult.
Wednesday, November 12. The Judges delivered their opinions.
JUDGE' TUCKER. ■
The appellee, the widow of Joseph Rowton, filed her bill against the appellant, his father, for dower in 400 acres of land, to which she alleges the son had an equitable title in fee-simple ; the foundation of which will be stated hereafter. The defendant, the father, in the most express and positive terms, denies, all the allegations of the bill.
The original foundation of the widow’s claim is thus stated by Thomas Harvey, one of the witnesses; that in the year 1787 or 1788, Joseph Rowton, the son, being on a visit at his father’s in Charlotte County, (from New River, where he had lived for some time,) came to the witness’s house, and asked him to ride over to his father’s, which he did. When there, old Rowton said to the witness, “I want my son Joe to-come and live by me; he is a handy man, and I want him to live by me: I intend to give the land over Cub Creek to my son William, the place where I now live to my son John, and the place where Erank Clark lived to my son Joe:” then added, that William and Joe should pay the taxes on their parts, but he would pay them on John’s. Joseph answered his father, “I don’t like to improve the land, without I have a right to it;” the old man answered; ‘‘My son, I have .willed it to you, and I will never take it away from you, while I live, and what more do you want?” “Well, then,” replied. Joe, “I will move down.” That Joseph Rowton did move down to the land, made considerable improvements on it, and continued there till the day of his death. Joseph appears to have been at that time married to the complainant, his widow, by whom he never *had any child. No other person is stated, or appears to have been present at this conversation. The credit of Thomas Harvey is no where impeached, unless the total denial of all the facts charged in the bill, or of any promise made by the father to the son, to make him an estate of inheritance in the land, be considered as such.
Charles M’Kinney, another witness,, among other things, deposes, that some time in 1793, he was requested by Joseph Rowton, the son, to join him in building a mill on the land, to which he objected, unless his father would make him a deed for it. Jo *55 seph then requested the witness to ask his father if he was willing to make him a deed for the land, which he did: old Rowton answered, “that he had given it to him, and willed it to him, and given him the patent for it, and lhat his son had possessed it, and paid taxes ior it for several years, and he did not know what he wanted, but, if he could not take his word, he would give him a deed for it.” Whether Ihe mill was actually built by Joseph, or any thing done towards it, except some preparations for catting stones for it, does not clearly appear, I think, from the record. To counteract this evidence, there is an immense mass of testimony in the record, (some of which was objected to on the part of the widow, and, in my apprehension, very properly, particularly the affidavit of William Row-ton, jun. taken at his father’s house before a magistrate, who would not permit him to be cross-examined, and several others appear to have been taken in the same manner,) to prove repeated declarations by old Rowton, that he had never given his son the land, nor ever intended to give it to him but for his life, unless he had children ; that he always paid the taxes; that he threatened some persons, whom he found cutting timber upon it, with a suit; lhat Joseph Rowton, on a variety of occasions, said he had no right to the land, and that he was afraid bis father never would make him a right to it; that, on more than one occasion, he endeavoured, through the medium of friends, to prevail on his father to make him a deed, who constantly refused, alleging he never intended to give any of his sons more than a life estate in their lands, unless they should have children, that the lands might not go out of his own family. But none of the testimony goes to contradict the declarations made to Thomas Harvey and Charles M’Kinney. Joseph Rowton’s acknowledgments, as above stated, appear always to have been made as a ground of complaint and dissatisfaction *al his father’s conduct, but never to him, or in his presence.
Having thus stated what I consider to be the substance of the whole evidence on both sides, as far as it appears to me to be material, I shall proceed to consider it.
The testimony of Thomas Harvey is a direct, substantial, and positive affirmation of a particular fact, not contradicted by any other iestimony, nor even denied by the answer, except by implication and evasion; and, to my apprehension, amounts to full proof of a contract between the father and the son, in the terms detailed in his deposition. I consider it as an undeniable position, both at law and in equity, that "one witness, whose credibility is not impeached, who deposes clearly and positively, in affirmation of any fact to which that witness was privy, is entitled to belief more than a dozen witnesses, who merely depose to their own ignorance of that particular fact, though by possibility they might have been in such a situation as to have seen or heard the same, if their attention had been called to the acts or words of the parties at the time. As, if a question were made, upon the plea of nil debet, at law, whether the supposed indorser of a bill of exchange actually did write his name on the back of it, if one witness, present in a coffee-house or exchange, should swear that he saw the parly write his name upon the bill, such evidence, if the credit of the witness be unimpeached, ought to weigh more than the testimony of a dozen persons present in the same coffee-house at the same time, who should swear that they did not see him write his name on the bill, though all of them were in such situations as that, by possibility, they might have seen him do so, or might have remembered that he did so, had their attention been equally drawn that way, as that of the witness affirming the fact. And such testimony ought, moreover, to countervail that of fifty witnesses declaring that they had heard the supposed indorser declare that he never had indorsed a bill of exchange in his life, nor ever would as long as he should live. Now, the indorsement, in the one case, and the contract between the father and son, in the present case, being the very gist and foundation of the suit in each case, if the proof of the execution, in either, rest upon such positive, direct, and affirmative testimony, ought that evidence to be shaken by the declarations of witnesses not present at its completion? If not, the proof of the original contract between the father and the son, in the presence of Thomas Harvey, and of the confirmation thereof, afterwards, in the presence of, or, rather, addressed to Charles M’Kinney, *as the agent or friend of the son, remains unimpeached by all the testimony produced on the part of the father. For although the son’s declarations, that he had no right to his land, and that he feared his father never would make him a right to it, may seem to countenance an acknowledgment on his part, that he had in fact no claim upon his father for the land, but enjoyed it merely through the old man’s curtesy, as he expresses it in his answer, yet this never was the language of renunciation, or of release to his father, but merely of complaint to his family, friends and .neighbours. The word right is generally used in a popular sense in this country, as synonymous with a deed, and in that sense, was properly used by the son, when complaining of his father’s conduct. Or if it were not, he possibly was not sufficiently versed in the maxims of law or equity to know, that, by performing a thing at his father’s request, whereby he had incurred considerable charge and expense, he had acquired a right to compel his father to perform his promise. What then was old Rowton’s promise? If you will move down and settle upon the land, it shall be yours. “I have already willed it to you, and I will never take it from you while I live.” “Then,” said the son, “I will move down;” and he did so; this was a promise founded on a consideration chargeable to him to whom the promise was made; and though no benefit should accrue to the father, the circumstance of its being attended on the part of the son, with a charge and expense, made it binding on the father. The interpretation, as understood by the son, was, that he was to have an absolute estate in the land; for he expressly refused to move down and improve *56 the land, unless his father would give him a right to it. “My son,” said the father, “I have willed it to you, and will never take it from you while X live. ’ ’ The word willed, it is true, is not a technical word, but connected with the preceding conversation and condition, insisted upon by the son, it ought to be understood in the most liberal and beneficial sense for the son: for they are the words of the father! et verba fortius accipiuntur contra proferentem. Old Row-ton evidently meant, in his answer, to avail himself of the equivocal sense in which the word willed might have been used by him: but that ought not to serve his purpose. He betrayed his son into expense, in removing and improving the place: an expense probably little suited to his circumstances, and which he never would have incurred but for his father’s proposal and promise. And this, in my opinion, takes the case completely out of the operation *of the statute of frauds, which certainly was not meant or intended to countenance or encourage fraud in one from whom the contract first moved. Having fully complied with all the old man proposed, incurred expense and improved the place, I hold him well entitled to a performance of his father’s promise, in a manner most beneficial for himself and family, and, therefore, am of opinion, that the decree be affirmed.
JUDGE ROANE.
In no case which ever occurred before me, was the policy and utilit3'' of the statute of frauds made more manifest, than in the present. The great mass of conflicting testimony existing in it, makes it probable that those perjuries and evils may have been produced, which it was the peculiar object of the statute to prevent. We are told(a) that the English statute (which is substantially .like ours) was made to avoid perjuries, and prevent persons from swearing verbal agreements upon others, and thereby charging them in equity to perform them.
The act of frauds is relied on in the present case; and the agreement, as charged of a promise to convey an estate of inheritance to the son, is not confessed, but on the contrary, is expressly denied in the answer. There is no pretext, therefore, on the ground of confession, for a Court of Equity to dispense with the forms required by the statute. It is not even confessed in the answer, that a promise was made to the son of an estate for his life; the father, on the contrary, expressly says therein, that he permitted his son to live upon the land, on curtesy merely. It is true that the son entered upon the land and improved it, and this, it is said, is an execution of the contract, and supersedes the necessity of proving a written agreement. This is admitted; but yet an agreement must be proved commensurate with the interest on which the appellee founds her claim of dower. I take the rule to be, that in case of part performance of a contract, the plaintiff, after shewing such performance as here, by building, &c. may then go on to prove the agreement, by the confession of the defendant, or by evidence aliunde; but certainly, a proof of performance, while it dispenses with the necessity o^ a writing, does not supply all evidence whatever of the agreement.(b) In the case before us, therefore, the execution of a contract shall be referred to the agreement as confessed; viz. of an estate upon curtesy, unless an agreement to give a larger interest is proved against the father.
But admitting .that the improvements made in the present ^instance are not referable merely to the title of curtesy admitted in the answer; — to a claim resting only on parental justice and affection ; may they not be referred to, and stand justified by, a promise of an estate for life to the son, with remainder in fee, if he had issue; which, although not admitted in the answer, is the most that can be said to be proved against the father by the testimony? Was not the promise of such an interest enough to justify the improvements made by the son? And if we go beyond this line; if we refer the expense and improvements in question, to the promise of an estate in fee, must we not prove the existence of such promise? Shall the proof of improvements which will consist with, and are justified by the promise as admitted or proved, be not satisfied thereby; but carry us without proof, to an extension of the promise to the farthest possible limits : — to dispense not only with the forms required by the statute of frauds, but to the adoption of an inference, bottomed on no proof at all, and the most strong which could possibly be made against that person for whose benefit the act of frauds was provided? Is there, in short, any reason for setting upa construction of the statute, in dispensing with written evidence, which will justify a deduction of an agreement from no adequate testimony whatever? Every thing that I now say in relation to a case of total deficiency of testimony, equally applies to cases in which the testimony aliunde is outweighed by the testimony of the answer, and therefore, is no evidence whereon to ground any decree whatever.
The wife, in the present case, stands on no better ground than the son would do, if he were suing for a specific performance. She was married before the promise spoken of by T. Harvey, and therefore was not influenced by it: the conversation stated by M’Kinney to have taken place in 1779, was not addressed to the son, nor is there any certain proof that it ever came to his knowledge.
The charge in the bill is, that the son was entitled to the land in question by promise from the father, who assured him that a conveyance should at any time be made him. The very words in which the promise was made (if indeed any promise is expressly alleged) are not set out. The charge is of an estate of inheritance, for a lesser interest would not suffice for the wife: but that charge is made by way of inference, and not totidem verbis with any promise: the defendant is called on to answer the premises. In his answer he denies having ever promised any estate of inheritance, or any such estate as in the said bill is pretended, and he *even *57 negatives a promise of a life interest, by saying that his son lived on the land by curtesy merely. Is it not enough that he has answered the bill in the manner propounded by the bill itself? Is it necessary that he should have entered into a special negation of the particulars of a promise, when none such is set out in the bill? Has he not denied the allegation actually made (at most) in the bill, of a promise of an estate of inheritance ; and even gone beyond it, by denying even the promise of an estate for life? Shall a plaintiff who calls a defendant into a Court of Equity, be permitted to deny the sufficiency of an answer made by a mere negation of the fact charged, and with, af least, as much particularity as the charge itself is made?
The testimony of T. Harvey, I admit, is extremely strong, but it is outweighed by the testimony of the answer: that testimony will not prevail against the answer, unless it is corroborated by other evidence; and if the answer is equally corroborated, it will still preponderate. The testimony of T. Harvey, therefore, taken singly, is wholly insufficient to establish the agreement in question.
I will take a short view of the testimony supporting that deposition, and of that supporting the answer. M’Kinney says, that in 1779 or 1780, he heard old Rowton declare his intentions relative to his son Joseph, but these were merely his intentions, not declared to Joseph, and formed no contract. He says, that in 1791, old Rowton said he had willed the land to Joe, (but it does not appear what estate therein was willed,) and had given him the patent therefor. Abundant other testimony in this cause shews, that the patent was merely delivered to enable the son to ascertain the lines of the tract. He says, (in addition,) that in 1791, old Rowton, speaking respecting a mill seat, said he would make his son a deed for the land : but C. another witness, on the contrary, says, that Joseph Rowton told Isim his father had refused to make him a right even for the mill seat. H. Hines also proves a refusal on the part of old Rowton, and these, with other circumstances as to this subject, outweigh M’Kinriey’s testimony respecting the willingness of old Rowton to make a deed. Puckett’s testimony seems somewhat in favour of the appellee, but it is discredited by Molloy Row Ion’s relation of a different account having been given by him, at the time of the conversation between old Rowton and himself. W. Harvey proves merely general declarations by old Rowton of his intentions, but not made to Joseph. As to the testimony of old Rowton’s declarations at the funeral, I lay no stress whatever upon them. His situation and feelings, at the time, produced those declarations, *wfaich I regret exceedingly he has not substantiated: but we are to be governed by the law of the case.
Such is the testimony coming in aid of T. Harvey’s deposition. I doubt whether (checked as I have already stated it to be) it would outweigh the single answer of the father : but that answer is, on the contrary, powerfully supported.
W. Rowton, jun. (disinterested at the time) says that after his brother Joseph settled on the land, he heard him say “that his father never promised him the land longer than for his life, and then to return to the rest of the children.” Suppose Joseph were now suing for a title, would not this admission completely stop him. H. II. and J. B. prove Joseph’s declarations (less strong) but to the same effect. S. B. heard Joseph say, a few days before his death, “that his father still refused to give him the land.” W. B. heard Joseph say, after he lived on the land, that he had no right to his land, except he had children. Many witnesses prove old Rowton’s declarations to the same effect. M. P. B. to the same effect. B. W. and N. B. both say they have often heard Joseph say, since he lived upon the land, that his father never would agree to give him the land longer than for life ; and the latter witness proves that the appellee admitted that her husband knew this before he moved down. J. W. has heard Joseph say, he had no right to the land, and did not know whether his father ever would give him one. I will readily admit, that this term 1‘right,” standing singly, might be taken as meaning a deed; but in this case, where there is so much testimony shewing even Joseph’s own admission that no agreement had ever been made to convey the land, I cannot understand it in that limited sense.
Several affidavits taken in this cause, and read in the Court of Chancery, are objected to, on the ground that M’Kinney was prevented from asking questions. The answer is, that if it is now (in this Court) regular to make the objection, yet M’Kinney is not shewn to have been an agent; and, if not, he had certainly no right to obtrude himself into the cause: he was often asked by the magistrate to shew bis authority for intermeddling in the cause, but shewed none. Unless, therefore, we are prepared to say that a magistrate is bound to permit any person whatever to examine witnesses convened before him by the parties to a suit, we must adrail that his refusal in this instance was correct. But whether he were shewn to be an agent or not, his manifest ""'solicitude on this subject would, at least, weaken his testimony, considered to be so important by the appellee.
1 have thus glanced at the testimony in this cause. In general, I do not think it necessary to particularise and comment upon the testimony ; but in cases depending upon it, I think it enough to declare the result of my reflections thereupon. In this case, however, it seems necessary, as a difference of opinion exists as to the weight of evidence.
With deference to the opinions of other gentlemen, I must contend, that the evidence of the answer, and other testimony agreeing therewith, greatly preponderate in this case, and that there is no agreement proved in this cause, which will au-thorise us to sustain the pretensions of the ajipellee, and that, therefore, the decree should be reversed.
JUDGE FLEMING.
The only material question in this cause seems to be, whether the appellee has shewn a title in equity, to *58 dower in the lands in question, of which her late husband died possessed? And, there being a great contrariety of testimony in the case, it required more than ordinary attention to scan it, in order to discern on which side the evidence preponderates. The two most material witnesses in favour of the claim, are Thomas Harvey and Charles M’Kinney: and, though I cannot suppose either of them guilty of perjury, yet there are circumstances disclosed in the course of the testimony, sufficient to convince me, that each of them had a strong bias on his mind in favour of the appellee; and, first, with respect to Harvey. — It appears that the timber which J. Puckett in his deposition mentions himself to have been employed in cutting, when challenged for so doing by old Rowton, was for Harvey’s saw-mill; who, no doubt, as the timber was cut by leave of Joseph Rowton, wished the title in the land to be established in him; especially as old Rowton threatened him with a suit for procuring that very timber to be cut: and I have not a doubt but Puckett, who was employed by Harvey to get the timber, has sworn falsely; for he says in his deposition, that, as soon as he told old Rowton he was getting the timber by Joseph’s permission, the old man replied, “Very well, for it is Joseph’s land, and he had a right to do as he pleased with his own;” which was very different from the old man’s conduct and conversation respecting the land, and is not to be believed: especially as he (Puckett) told one of the witnesses (when he went to grind his axes, soon after the transaction) that “when he *was cutting timber off the land for Thomas Harvey’s saw-mill, old Rowton was very angry,— asked what right his son had to give Tom Harvey leave? said that his son Joseph had not a foot of land that he knew of; and ordered Puckett to clear himself off the land, and cut no more timber on it — damned him, and Tom Harvey too, and said he would sue them both.” This, I believe, was a true account of the matter, as it was told immediately after it happened, and seems perfectly consistent with the temper and general conduct of old Rowton.' — 'With respect to M’Kinney, it appears from his own deposition, as well as from other testimony in the cause, that he was anxious to join Joseph Rowton in building a mill on the land, which the latter would not undertake, unless he had an absolute title to it. It also appears by the record, that M’Kinney, although a witness himself, and not an agent of the appellee, was busy interrogating other witnesses on their examination, until restrained by the magistrate before whom their depositions were taken; and, to shew his .enmity to, and prejudice against William Rowton, sen. he told one of the witnesses, that if he was in Joseph Rowton’s place, he would hire negroes, cut down the land, and wear it out.
These circumstances induce me to attend to the testimony of M’Kinney and Harvey with caution an4 distrust. Thomas Harvey says, that in 1787 or 1788, he was at old ‘Rowton’s with his son Joe, who then lived on New River, when the father said to the deponent, “I want my son Joe to come down and live by me; he is a handyman. — I intend to give the land where Prank Clarke lived, (being the land in question,) to my son Joe;” Joseph answered his father, “I don’t like to improve land without I have a right to it.” The old man answered, “My son, I have willed it to you, and I’ll never take it away from you while I live, and what more do you want?” “Well then,” replied Joseph, “I will come down. ” He did move down to the same land, made considerable improvements on it, and continued there until his death. Admitting the above relation of a conversation between William Rowton and his son Joseph, to be literally true, it does not, in my conception, amount to a contract to convey to the latter a fee-simple in the land in question. It was a promise (on good consideration I admit) that Jospeh should enjoy the land, at least during- the life of the father, and every one knows that a will may be revoked at any time during the life of the testator. — • Charles M’Kinney says, that in 1779 or 1730, William Rowton, sen. speaking of dividing his lands among his sons, *said he had given to Jospeh 400 acres on Rattle Snake Creek; that Joe had < ; . : hired John Smith, his brother-in-law, to clear a piece of ground, and build a cabin on his part of the land, which he intended for a shop; (there was a beginning of an improvement about that time, but it was dropped, in consequence of Joseph’s going a tour in the army;) that in 1787, one James Rather settled on the land, by permission of William Rowton, sen. and it being reported that Rather had a lease for i ■ ■ • : : ■ ■ : ; ' . ; : : ; : ■ seven j-ears, the old man said it was false; —that he permitted him to remain there only until his son Joseph should see cause to come himself, let the time be long or short, and, that in the month of April, 1789, Joseph came from New River, and took possession. What M’Kinney and other witnesses have said respecting the taxes, finding the lines, and William Rowton, junior’s having, in 1788, rented the land to Francis Clarke, in behalf of his brother Joseph, is perfectly consistent with the latter’s having only an estate for life in it; and the circumstance of the patent’s having been sent to him, is fully' explained by several of the witnesses, as being for the purpose of finding the lines between Row-ton and Stith. M’Kinney further deposeth, that, when he was about joining Joseph Rowton in building a mill on the land, he requested the deponent to ask his father if he was willing to make him a deed for it? which he did, and old Rowton answered, “that he had given it to him, and willed it to him, and given him the patent of it, and that the said Joseph had possessed it, and paid taxes on it for several years, and he did not know what more he wanted: but if he would not take his word, he would give him a deed for it.” But the witness does not say what kind of deed — whether to convey a fee, an estate for life, or a lesser estate; besides, the declaration (if made at all, which I very much doubt) was without consideration, and made to a third person, in the absence of Joseph; who, it seems, paid no regard to it, since it doth not appear that he ever applied for the deed, or *59 began to erect a mill on the premises; and Peter Stern, who was in the habit of cutting and furnishing mill stories, deposeth, that Joseph Rowton, in a conversation with him on the subject, informed him that he had asked his father for two or three acres to set a mill on, but he refused, and told him that he had not made him a right, and never would. The depositions of three Harveys, and of W. Hannah, &c. were all taken on the same side of the cause, but are too unimportant to require further notice. Opposed to this testimony in favour of the appellee, is, 1st. The answer of William Rowton, the appellant, who expressly ^swears, that, though he permitted his son Joseph to live on the land, he never did promise, but always refused to make him a title, because he neither had, nor was likely to have a child; and he -was determined that the inheritance should not go out of the family; and that he sent the patent to Joseph to enable him to find the line between him and Thomas Stith. This answer (according to well settled rules of evidence) is paramount to, and refutes the testimony of Thomas Harvey; even if he had sworn, that William JSowton, sen. had promised his son Joseph to convey the land to him in fee, by an absolute deed. The answer is, however, strongly corroborated, by the testimony of a number of witnesses, who depose to the frequent and uniform declarations of the appellant (for a number of years) to the same effect; and for the same reason, that he was determined that the inheritance of the land should not go out of the family. And (what is still stronger and more convincing) several of the witnesses depose to the repeated confessions of Joseph Rowton himself, that his father never would promise, or agree, to make him an absolute title to the land in question, of which he was often heard to complain. From this view of the evidence, it appears to me, that the weight of it is in favour of the appellant. And this is a very striking case, among many others, which, to my mind, evince the wisdom, propriety and good policy of the statute of frauds and perjuries, which, in my conception, ought not to be disregarded and overleaped by Courts of Equity, upon such slight and trivial grounds. I am of opinion, upon the whole, that the decree is erroneous; that the injunction ought to be dissolved, and the appellant to have the benefit of his judgment at law.
JUDGE CARRINGTON.
It is admitted that the answer promptly denies the allegations of the bill; in which case it is an established rule in equity, that to disprove the truth of an answer, two witnesses are necessary, or one witness, aided by corroborating circumstances.
In the present case, there are two prompt witnesses supporting the bill and contradicting the answer. The first of these is Thomas Harvey, who proves, that in a conversation moved by the father to the witness, the father expressed a desire that his son. the then husband of the appellee, would remove from a distant country and live near him, and said that he intended to give the son the lands in question ; that the son, being present, observed, that he did not care to improve land, without a right to it; to which the father answered, *that he had willed the land to the son, and he never would take it from him; that thereupon the son accepted the offer, and did actually remove himself and family to the land, was put info possession by the father, made improvements, and occupied it till the day of his death : and thus, I think an equitable title to hold the land in fee-simple was vested in the son.
In aid of this testimony is that of Charles M’Kinney, (whose credibility is no where doubted, but by the counsel for the appellant) who proves that the father, on being pressed to do his son justice, answered, “1 have given my son the land — have willed it to him ; he is in possession ; he has paid the taxes; I do not know what more he wants: but, if he cannot take my word, I will make him a deed.” Upon such a contract and x^erformance of the consideration, I have supposed that, upon application to a Court of Equity, a specific performance on the side of the father would most certainly have been decreed.
What are the circumstances in aid of the testimony of those two witnesses, if indeed any were necessary? They are that a man by the name of Clarke rented the land as of Joseph Rowton; that the son abandoned a satisfactory settlement afar off at the particular instance of the father, incurred the fatigue and expense of moving himself and family to those lands, paid the taxes and made considerable improvements; that the father had at different times declared the lands to be the lands of his son, and that the son had for many years occupied them as his own. All these circumstances, combined with the testimony of the two witnesses, prove to me the engagement of the father and the consequent expectations of the son.
I presume it wil' not be denied that, when a contract occurs between two people, neither can, by subsequent declarations of his own, annul that contract without the assent of the other. It must also be admitted, that he who performs the contract on his part may in equity compel the other to perform on his part.
A number of witnesses prove declarations of the father that he never meant to convey more than an estate for life, unless the son should have a child or children. But did this release himself from a solemn compact without reserve? He had promised a right to the land by will or deed; and the general understanding of people of his class is that a right to lands is an absolute title, and all his own subsequent declarations had no effect to destroy the original contract moved by himself.
*It is true that a number of witnesses prove loose conversations with Joseph Rowton on this subject, and much industry has been used to turn them to his disadvantage. He was heard to say that his father would never, he feared, make him a title. Some have sworn that he said his father never promised a title unless he should have children. But what is the fact? The two witnesses prove the contrary. And Joseph Rowton always, when speaking on the subject, spoke in a style of complaint. *60 and considered it as a grievance that his father would not comply with his contract, and do him justice. But, because he did not sue his father, his forbearance is to be construed into a release of the contract! He might have had a tenderness for his father, or he might have mistaken his rights. If after-conversations with unau-thorised persons are to have any weight, let those of the father expressed differently at different times be set against those of the son, which will leave the matter as it stood upon the original contract.
It is observable, however, that at least nine of the witnesses, who press most hard upon the title or equitable claim of the son, were examined and mere afiSdavits taken, (for any thing that appears,) without authority, without notice, and, for aught appears, in the absence of the appellee, whose friend was not permitted to interrogate a single witness. For these causes an exception was taken to those affidavits, which exception was undoubtedly well-founded. The Chancellor, it is presumed, paid no respect to those affidavits, nor do I; especially when it appears that the greater part of those witnesses were the family of Rowton, who expected a benefit from the sale of those lands and a distribution of their value. Those witnesses, if their depositions had been regularly taken, are admitted to be competent; but I own they have not that weight with me which they would have had if entirely disinterested.
The statute of frauds has been mentioned ■as a bar to the claim of .the appellee. My construction of that statute is.that it was enacted to prevent, and not to protect fraud, .by sheltering a man against the performance of a voluntary contract where he had received a valuable consideration.
As a proof of the appellant’s own opinion of this contract, my attention has been drawn to a very late- declaration of his. When in his serious moments attending the funeral of a murdered son, he said to the son-in-law of the appellee, “go, and take care of your mother-in-law; there is a good plantation and house, it will be your own at her death.” Although the old man was mistaken as to the *legal course the estate might take, it shewed that he then had no pretence to the lands.
I consider the whole transaction as a premeditated fraud on an unfortunate woman. She was induced to leave her parents and connexions in a distant country to come hither with her husband, upon a fair prospect, that, in case of his death, she would have at least an establishment for life. But how was she disappointed I The violent hand of the murderer deprived her of her husband, the ruffian hand of a cruel father-in-law ousted her from the lands of that husband; and thus she is abandoned to want and distress amongst inhospitable strangers. A greater fraud is seldom perpetrated.
Upon the whole of the circumstances of this case, I am clearly of opinion that the appellee is entitled to dower in the lands in question, and that the decree ought to be affirmed.
JUDGE EYONS.
This suit must have been brought on an after-thought of the widow plaintiff or her friends, by the advice of others who prompted and encouraged her to teaze and vex old Rowton for turning her out of possession, and, perhaps, from private pique or animosity, because she well knew she had no good grounds for the suit, as her husband often told her that he had but a life estate in the land.,
I have alwaj’s understood that agreements of every kind were to be executed according to the true intent and meaning of the parties thereto, as expressed and fully understood by themselves, and not as understood by others no wa}' concerned or interested in the business; for the parties best know their own agreements.
The father, in this case, swears in his answer that he never gave, promised, or intended to give his son an estate in fee, or more than an estate for life in the land, unless he had issue; and the son, at all times after the bargain, during his life, acknowledged and declared that his father never did promise or agree to give him more thin an estate for life in it, and that he never expected more, unless he had issue.
Yet the Chancellor has decreed a fee-simple, and has given dower to the widow, who never expected it, as was plainly evinced by her injuring the land and houses greatly, according to the testimony, at the time of her removal from the plantation, carrying away locks, plank, &c.
The evidence in this cause has been compared to that in a case propounded relative to a bill of exchange; where one person only should prove that A. endorsed it, although *twenty others in the room where the endorsement was written did not see or observe it, and it was said that, in such a case, A. would be made liable as endorser. But if B. the endorsee and holder of the bill had always, and long after, declared that A. did not write his name, nor ever endorsed it to him, but constantly refused to do so, and the executors of B. should sue A. as endorser, would any Court or Jury oblige B. to pay the debt? Now the holder of the land in this case having always declared, after the pretended promise in the bill, that he had only an estate for life in the land, and that his father had never agreed to give him a geater estate, is his widow or heir to have more than he claimed himself? The answer to that question is so plain and evident, and the case so clear, táat I should have no doubt about it, exclusive of the statute of frauds, but should dismiss the claim as groundless and fraudulent.
The affidavits, although excepted to at the rules, were not objected to at the hearing, but allowed to be read; whereby the former exception was waived, and cannot now be repeated in this Court; and, as the cause was not heard on a mere motion to dissolve the injunction, but set down for a full and regular hearing in due course of law, it is not to be retained or remanded for an}' farther proceedings; which, in *61 deed, the counsel did not desire. The decree therefore must be reversed, the injunction dissolved, and the bill dismissed with costs.

 Powel on Contracts, vol. 1, p. 269.

 1 Fonb. 172.